## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

REGINA BRYANT,             **CASE NO. 1:22-cv-00207**

          **Plaintiff,**

    **-vs-**               **JUDGE PAMELA A. BARKER**

DENIS MCDONOUGH, SECRETARY
OF THE UNITED STATES DEP'T      **MEMORANDUM OPINION AND**
OF VETERANS AFFAIRS           **ORDER**

            **Defendants.**

Currently pending is the Motion of Defendant Secretary of the United States Department of Veterans Affairs Denis McDonough ("Defendant") for Summary Judgment. (Doc. No. 48.) *Pro se* Plaintiff Regina Bryant ("Plaintiff" or "Bryant") filed an Opposition on October 23, 2023, to which Defendant replied on November 7, 2023. (Doc. Nos. 49, 50.) For the following reasons, Defendant's Motion for Summary Judgment (Doc. No. 48) is GRANTED.

## I.   Facts

### A.   Bryant's Position in the Sterile Processing Department

In March 2013, Bryant began working as a technician in the Sterile Processing Department (also known as "Sterile Processing Service" or "SPS") at the Louis Stokes VA Medical Center (hereinafter "VAMC") in Cleveland, Ohio.[1] (Deposition of R. Bryant dated July 27, 2023 (Doc. No. 46-1) at Tr. 8.) As a broad overview, Bryant's job responsibilities as a SPS technician included cleaning, assembling, sterilizing, and processing surgical tools for the VAMC's operating rooms

---

[1] Bryant testified that she was hired as a "Schedule A" employee. (Deposition of R. Bryant dated July 27, 2023 (Doc. No. 46-1) at Tr. 42-43, 55.) Federal employers can hire individuals with "severe physical disabilities, psychiatric disabilities, and intellectual disabilities" under Schedule A of 5 C.F.R. 213.3102(u). Bryant testified that the basis of her "Schedule A" status was her learning disability. (*Id.* at Tr. 55.)

("OR") and outpatient clinics; as well as putting together "case carts" and "pill packs" for surgeries. (Bryant 7/27/23 Depo. at Tr. 10.)

During her deposition, Bryant explained in more detail the work performed by SPS technicians, as follows.  When a surgical procedure is completed, the OR sends a case cart full of dirty surgical instruments to SPS using an elevator that opens directly into the so-called "Decontamination Room."  (*Id*. at Tr. 11, 13-14.)  In the Decontamination Room, SPS technicians manually clean the instruments in a large sink and transfer them to a sonic machine that washes the instruments.  (*Id.* at Tr. 14-15, 27.)  The SPS technicians then carry the instruments to a second, larger machine that washes the instruments again.  (*Id*. at Tr. 15-16, 27.)  The larger machine is opened by technicians in the "clean area" of SPS where the instruments are placed in one of three Autoclave machines, which heat the instruments in a large oven for final sterilization.  (*Id*. at Tr. 11-12, 27-28, 30-31, 35-36.) The SPS technicians then reassemble the tools and prepare instrument trays for future surgeries. (*Id*. at Tr. 34.)

Some instruments, however, "cannot take any kind of heat" and, thus, cannot be placed into the Autoclave machines.  (*Id.* at Tr. 30, 33.)  For these instruments (such as stethoscopes), SPS technicians use a "STERRAD" machine to sterilize the equipment.  (*Id*.)  The STERRAD machine is kept in a small room within SPS, in which technicians can sit down and wrap the instruments once they are ready to be returned for use.  (*Id*. at Tr. 33-34, 36.)

Additionally, if the OR or an outpatient clinic needs a tray of instruments to be delivered or picked up, SPS technicians are required to go to the various locations within the VAMC to assist. (*Id*. at Tr. 31-32.)  As Bryant explained in her deposition:

> The OR runner is whenever the OR is having cases going, they're having surgeries going on, they need somebody -- they call down and say, I need this, I need this

2

[instrument] tray, I need that tray, I need you to bring me up something. So that person is responsible -- their job that day is to do OR. So you're constantly going up and down, going up pulling cases for the OR all day long.  So if they need a new case pulled, like someone may be having some kind of accident, and it's an emergency, so you have to pull that case for the OR right then and there. They'll call you, we need this case, it's an emergency. So that happens, that happens all day long.

Then there was a clinic runner, which is the person who goes around to all the clinics in the hospital, which could be podiatry, eyes, ears. There's a whole bunch of clinics. You have to take the [instrument] trays up to their department, their trays -- they have certain instruments that they use, you have to take the trays up to their department, and you have to bring down all their dirty trays too.

So if they have scopes that go down, you have to go pick up those dirty scopes, and you have to take them down and decontam[inate]. So you're going around all day long to all the clinics, every clinic in the hospital and picking up dirty instruments. Because the dirty instruments are not allowed to sit for a long time, they have to be taken and washed. They can't be sitting there because the dirt dries up. So that's the job of the clinic runner.

(*Id*. at Tr. 31-33.)

To accomplish this varied work, at all times relevant herein, SPS assigned technicians to the following six, specific job assignments: (1) Decontamination (or "Decontam"); (2) Autoclave; (3) OR Runner; (4) Clinic Runner; (5) STERRAD; and (6) Assembly.  (*Id*. at Tr. 30-31, 34.)  Bryant testified that she considered the Decontamination, Autoclave, OR Runner, and Clinic Runner assignments to be "heavy assignments," because they required a technician to lift instrument trays weighing up to 20 to 25 pounds, and/or stand or walk throughout the day.  (*Id*. at Tr. 22-23, 34-35.) By contrast, Bryant considered the STERRAD and Assembly assignments to be "easy assignments" because they allowed the technician to sit throughout most of the shift.  (*Id*. at Tr. 34-35.)

The SPS has three shifts.  (*Id*. at Tr. 37.)  In October 2017, Bryant worked the first shift, which ran from 7:00 a.m. to 3:30 p.m.  (*Id*. at Tr. 29.)  At that time, there were a total of eight (8) SPS technicians on first shift.  (*Id*. at Tr. 41-43.)  In addition, each shift had a "Lead Tech," who was

responsible for establishing the weekly schedule of job assignments for the SPS technicians on that shift. (*Id*. at Tr. 29-30.) At all relevant times herein, Kara Deal was the "Lead Tech" for the first shift and was, thus, responsible for making the weekly schedule of job assignments for the first shift SPS technicians, including Bryant. (*Id*. at Tr. 29-30, 35, 37.)

As Lead Tech, Deal had discretion to determine the weekly schedule, including deciding which SPS technician would be assigned to which specific tasks throughout the week. (*Id*. at Tr. 76-77, 89.) However, according to Bryant, Deal was supposed to rotate the "heavy assignments" (i.e., Decontamination, Autoclave, OR Runner, and Clinic Runner) with the "easy assignments" (i.e., STERRAD and Assembly), so that a technician was not "constantly put on heavy assignments all the time." (*Id*. at Tr. 34-35.) As Bryant explained during her deposition:

> *** So, if I was in decontam [on] Monday, I would be on another assignment [on] Tuesday. Or I would end up being decontam sometime at the end of the week. *** [I]f you're on decontam on Monday, they'd put you maybe on instrument[] [Assembly] Tuesday. Put you in Autoclave, maybe Wednesday. That way you're giving your body a way of resting. ***

(*Id*. at Tr. 41.)

Sometimes, however, Deal had to "change up" the weekly schedule, either because a first shift technician called off sick or because of a particularly heavy workload. (*Id*. at Tr. 43-44, 86-88.) If this occurred, SPS technicians from other shifts could volunteer to come in and work overtime. (*Id*. at Tr. 44-45, 87-88.) For example, Bryant testified that, if the first shift was short staffed, second shift SPS technicians could (and often did) volunteer to come in a few hours early and work overtime on the first shift. (*Id*. at Tr. 45-46.) Such an "overtime technician" was not expected to necessarily arrive at the beginning of the first shift. (*Id*. at Tr. 46-47.) Rather, the "overtime technician" would often arrive a few hours into the first shift. (*Id*. at Tr. 46-47.)

4

As a result, if a first shift technician did not come into work on a particular day, Deal had the discretion to change the weekly schedule to ensure that all job assignments for that shift were covered. (*Id*. at Tr. 76-77, 83, 89.)  If an overtime technician had not yet arrived when the OR sent down dirty instruments to Decontamination, Deal would change the schedule to ensure that the Decontamination assignment was covered.[2]  (*Id*. at Tr. 53-54.) This was because, as Bryant acknowledged, decontamination of surgical instruments is critical to the functioning of the hospital.  (*Id*. at Tr. 89-90.)

B.     **Bryant's March 2016 EEO Complaint**

Bryant testified that, at all times relevant herein, Jeremy Pravlik was her "main supervisor" and Deal was the "Lead Tech" assigned to her shift.  (*Id*. at Tr. 28-29.)  Unfortunately, the record reflects that the working relationship between Bryant and Deal was often strained.

On March 6, 2016, Bryant filed a formal Complaint of Employment Discrimination with the Department of Veteran Affairs (hereinafter "VA") in which she alleged that Deal (1) discriminated against her because of her "mental disability;" (2) created a hostile work environment and defamed her character; and (3) harassed her.  (Doc. No. 53-1 at PageID#s 2129-2139.)  Bryant's disability discrimination claim was based on events occurring in December 2015 and January 2016. Specifically, Bryant alleged that Deal purposely placed a CD player next to her desk and refused to move it, even after Bryant indicated that the noise from the CD player made it difficult for her to focus and concentrate on her job due to her "documented disability."  (*Id*. at PageID#s 2130-2131.)

---

[2] According to Bryant, the OR did not generally begin sending down dirty instruments to the Decontamination Room until "around 10:30 a.m.," so everyone was "working on [instrument] trays until they came in."  (*Id*. at Tr. 47.)  Thus, Bryant testified that, if an overtime technician from another shift came in to substitute for an absent first shift technician and was "late" for the first shift, that overtime technician could nonetheless have been assigned to Decontamination because first shift technicians did not generally go back to Decontamination until 9:30 or 10:00 a.m.  (*Id*. at Tr. 47-48.)

In her "hostile work environment/defamation of character" claim, Bryant alleged that she requested a mediation between herself and Deal regarding the CD player issue and that "Ms. Deal took it upon herself to let EVERYBODY in my department … know about all my information regarding the mediation." (*Id.* at PageID# 2132.)  Bryant alleged that this information was supposed to be confidential and that, after Deal improperly disclosed it, Bryant's co-workers were afraid to approach or talk to Bryant. (*Id.* at PageID#s 2132-2133.)  Bryant further alleged that Deal ultimately removed the CD player from the Decontamination Room entirely and that Bryant was unfairly blamed for this by all her co-workers.  (*Id.* at PageID#s 2133-2135.)

Finally, in her harassment claim, Bryant alleged that "ever since [she] came to SPD, Ms. Deal has had a problem with me [and] has been bullying me, belittling me, and humiliating [] me in front of my co-worker[s]." (*Id.* at PageID# 2135.)  Bryant asserted that Deal showed "blunt favoritism" to her "select group of friends." (*Id.*)  She further alleged that Deal was trying to "sabotage" her by making a lot of noise, which makes it difficult for Bryant to concentrate. (*Id.* at PageID#s 2135-2136.)  Bryant alleged that Deal's behavior was causing her significant mental and emotional distress. (*Id.* at PageID# 2137.)

The VA forwarded Bryant's Complaint to an Equal Employment Opportunity ("EEO") investigator, who assigned Case Number 200H-0541-2016101966[3] and investigated Bryant's allegations. (Doc. No. 53-1 at PageID# 2140-2144.)  Bryant testified that a Final Agency Decision

---

[3] The Court will hereinafter refer to this EEO Complaint as either "the March 2016 EEO Complaint" or "EEO 1966" (i.e., the last four digits of the Case Number assigned to the EEO Complaint.)

6

("FAD") was issued on June 24, 2019,[4] dismissing her claims.  (Bryant 11/9/21 Depo. (Doc. No. 44-1) at Tr. 216-217.)

### C.    Bryant's Additional EEO Complaints and the October 2017 Incident

Meanwhile, Bryant continued to work as a first shift SPS technician while the investigation into EEO 1966 was pending.  Throughout 2017, Bryant reported continuing difficulties with Deal, her co-workers in SPS, and with the VA generally.[5]

The events giving rise to the instant lawsuit occurred in October 2017.  Specifically, on October 27, 2017, Bryant was assigned to work in STERRAD, which (as noted above) she considered to be an easier assignment because she was able to sit throughout her shift.  (Bryant 7/7/23 Depo. at Tr. 68-70, 75.)  SPS was short-staffed on that date and an overtime technician volunteered to come in to assist.  (*Id*.)  Deal changed the schedule for the day and reassigned Bryant from STERRAD to Decontamination, even though Bryant had already worked in Decontamination that week.  (*Id*.)  Deal assigned the overtime technician to STERRAD, i.e., the job that Bryant had originally been assigned to perform that day.  (*Id*.)  Similarly, on October 31, 2017, SPS was short-staffed and overtime

---

[4] A full and complete copy of this FAD does not appear to be part of the record before this Court in the instant action. *See* Doc. No. 51-1 at PageID#s 1476-1479.

[5] In June 2017, Bryant filed an EEO Complaint in which she alleged that her SPS co-workers were harassing her and creating a hostile work environment in retaliation for Bryant's March 2016 EEO Complaint. (Bryant 11/9/21 Depo. (Doc. No. 44-1) at Tr. 248-250.) Specifically, Bryant alleged that her co-workers stole her eyeglasses and intentionally "sabotaged" her by failing to relay messages from the OR and removing an instruction sheet from the STERRAD room, all to prevent her from performing her job duties. (*Id*.) *See also* Doc No. 51-1 at PageID#s 1760-1762. It is unclear from the record whether an investigation was conducted and/or whether a FAD was issued with respect this EEO Complaint. The record does show that, around this same time, Bryant began seeking employment opportunities elsewhere within the VAMC. Specifically, in May 2017, Bryant applied for a position as a Painter. (Doc. No. 51-1 at PageID# 1512.) Bryant was not selected for an interview and was notified that she was not eligible for the position on June 6, 2017. (*Id*.) Bryant subsequently filed an EEO Complaint on October 18, 2017, alleging that her non-selection for the 2017 VAMC Painter position was the result of disability and gender discrimination. (Doc. No. 51-1 at PageID# 1503.) The Department of Veterans Affairs, Office of Employment Discrimination Complaint Adjudication subsequently issued a FAD denying Bryant's Complaint with respect to her non-selection for the 2017 Painter position. (*Id*. at PageID#s 1511-1521.)

technicians came in to assist.  (*Id*. at Tr. 89.)  Once again, Deal changed the schedule by reassigning Bryant from an "easier assignment" to a "heavier assignment."[6]  (*Id*. at Tr. 83-84.)  Bryant testified that Deal again assigned the overtime technician to the "easier assignment" that had originally been assigned to Bryant.  (*Id.*)

Bryant testified that she believed Deal intentionally reassigned her to "heavier" assignments on October 27 and 31, 2017, in retaliation for her March 2016 EEO Complaint.  (*Id*. at Tr. 83, 114-115.)  She also testified that it was not just these two incidents in October 2017, but that Deal's allegedly retaliatory conduct had been going on "for months."  (*Id*. at Tr. 65, 115-117.)  Specifically, Bryant testified that Deal routinely assigned (or reassigned) jobs based on who her friends were, i.e., her friends got the "easier jobs" in STERRAD and Assembly, while Bryant was disproportionately assigned to the "heavier jobs" in Decontamination, Autoclave, OR Runner, and Clinic Runner.  (*Id*. at Tr. 118-119.)

On December 6, 2017, Bryant filed an EEO Complaint for "reprisal" for "prior EEO activity" based on Deal's decision to reassign Bryant to "heavier" job assignments on October 27 and 31, 2017.[7]  (Doc. No. 53-1 at PageID#s 2111.)  This Complaint was assigned Case Number 200H-0541-

---

[6] It is not entirely clear from Bryant's deposition testimony which assignment she originally had, and/or which assignment she was reassigned to, on October 31, 2017.  In an email dated November 2, 2017 (which is attached as an Exhibit to Bryant's "Supplement" to her Complaint in the instant case), Bryant indicates that, on October 31, 2017, she was originally assigned to be a Clinic Runner, but was then reassigned to OR Runner.  (Doc. No. 8-4 at PageID# 72.)  Although Bryant testified in deposition that both the OR Runner and Clinic Runner assignments are "heavy" assignments, she stated in her November 2, 2017 email that she believed that the OR Runner job was a heavier job than the Clinic Runner job. (*Id*.)

[7] In her EEO Complaint, Bryant listed the incident dates as October 27 and October 31, 2017.  (Doc. No. 53-1 at PageID# 2111.)  However, the EEO counselor later referred to the dates as October 23 and October 30, 2017.  (Doc. No. 53-1 at PageID# 2112.)  During her deposition, Bryant confirmed that the correct dates are the ones listed in the EEO Complaint (i.e., October 27 and October 31, 2017).  This is also consistent with several exhibits attached to Bryant's "Supplement to the Complaint." *See* Doc. No. 8-4 at PageID# 69-70; Doc. No. 8-4 at PageID# 72. Accordingly, the Court will refer to the October 27 and October 31, 2017 dates as originally presented in Bryant's EEO Complaint.

2018100764 and will be referred to herein as either "the December 2017 EEO Complaint" or "EEO 764." (*Id*. at PageID# 2112.)  On November 10, 2021, the Department of Veterans Affairs, Office of Employment Discrimination Complaint Adjudication (hereinafter "OEDCA") issued a FAD, dismissing Bryant's claims.  (Doc. No. 53-1 at PageID#2118-2128.)  The OEDCA concluded that Bryant "has not pointed to evidence otherwise sufficient to show that reprisal for EEO activity was the real reason for the Agency's actions." (*Id*. at PageID# 2122.)  The OEDCA further explained:

> Upon review, we again find that [Bryant] has not provided sufficient, probative evidence to rebut the reasons offered by the Agency for her work assignments. [Bryant] engaged in prior protected activity, of which management was aware, however, she has not offered evidence to show that her EEO activity motivated management's conduct here.  [Bryant] herself testified that [Deal] was already treating her poorly <u>before</u> she filed an EEO complaint against her. (R01, Tab 7-5 p. 158) [Deal] may have exhibited poor management conduct, but there is no evidence to show that it was related to [Bryant's] EEO activity.  A complainant's testimony regarding a subjective belief that management's actions were motivated by an unlawful discriminatory motive, without more, is insufficient to prove pretext. *Karma S. v. Department of Veterans Affairs*, EEOC Appeal No. 0120152734 (2017). In this case, we find that [Bryant's] testimony is inadequate to establish that management's responses were pretext to hide discriminatory motives. Without more, [Bryant's] unsupported allegations are insufficient to prove reprisal discrimination.

(*Id*. at PageID# 2123) (emphasis in original).[8]

While the December 2017 EEO Complaint was pending, Bryant continued to apply for employment opportunities elsewhere within the VAMC.  In early 2018, Bryant applied for a painter position.  *See Bryant v. Wilkie*, Case No. 1:20CV726 (Doc. No. 37-1 at PageID# 1280.)  She was selected for an interview but ultimately was not hired for the position.  (*Id.* at PageID#s 1280-1281.) On November 14, 2018, Bryant filed a Complaint of Employment Discrimination with the VA, in which she alleged that the VA discriminated against her based on her disability and gender when she

---

[8] The FAD also notes that, upon investigation, SPS management determined that Deal's conduct "could be perceived as favoritism" and that she was "provided additional education and training … regarding this issue."  (Doc. No. 53-1 at PageID# 2121.)  The FAD also indicates that Deal "no longer works in SPS."  (*Id.* at PageID# 2123.)

was not selected for the 2018 painter position. (Doc. No. 51-1 at PageID# 1530.) Subsequently, on February 8, 2019, Bryant filed another EEO Complaint, in which she alleged that she was subject to a hostile work environment on January 5, 2019 when management transferred one of Bryant's coworkers whom she had once accused of harassment, Dionna Arthur, to the same shift Bryant currently worked. *See Bryant v. Wilkie*, Case No. 1:20CV726 (N.D. Ohio) (Doc. No. 37-1 at PageID# 1278-1279.) Bryant's EEO Complaints were apparently consolidated and assigned Case Number 200H-0541-2019100638; and will be referred to herein as "EEO 638." (Doc. No. 51-1 at PageID# 1534.)

On January 10, 2020, the OEDCA issued a FAD, in which it concluded that the VA did not discriminate against Bryant based on either disability or gender when she was not selected for the Painter position in 2018. *See Bryant v. Wilkie*, Case No. 1:20CV726 (Doc. No. 37-1 at PageID#s 1277-1288.) In that same decision, the OEDCA rejected Bryant's harassment claim based on the transfer of Bryant's coworker to Bryant's current shift. (*Id*. at PageID# 1280.)

### D.      Bryant's Prior Federal Lawsuits

Prior to filing the instant action, Bryant filed three lawsuits in the Northern District of Ohio in connection with her various EEO Complaints. The Court will discuss the procedural histories of each of these lawsuits in turn, below.

#### 1.      *Bryant I*

On September 5, 2019, Bryant filed a *pro se* Complaint in this Court against then-Secretary of the VA, Robert Wilkie. *See Bryant v. Wilkie*, Case No. 1:19cv2048 (N.D. Ohio) (Oliver, J.) (Doc. No. 1) (hereinafter "*Bryant I*.") As an Exhibit, Bryant attached a Right to Sue Notice in connection with the denial of her March 2016 EEO Complaint, i.e., EEO 1966. (*Id*. at Doc. No. 1-1.) In her

Complaint, Bryant asserted claims for "Hostile Work Environment, Harassment, Reprisal, and Negligence under the Civil Rights [Act], Title VII 42:2000E." (*Id*. at Doc. No. 1, p. 6.)  Specifically, Bryant alleged that Deal publicly humiliated her; harassed her by moving the CD player next to Bryant's desk despite knowing of Bryant's learning disability; "use[d] her role as a supervisory figure to alienate other co-worker[s] from plaintiff;" and sabotaged her case carts and instrument trays.  (*Id*. at pp. 2-4, 6-10.) Bryant further alleged that Deal engaged in "unfair scheduling" by scheduling Bryant to "back-to-back heavy duty."  (*Id*. at p. 5.)  Bryant asserted that "this was all done in retaliation for filing an EEO Complaint."  (*Id*.)

On January 22, 2020, the Court *sua sponte* dismissed Bryant's *pro se* Complaint on the grounds that she failed to plausibly allege her harassment and hostile work environment claims.[9]  *See Bryant v. Wilkie*, 2020 WL 364224 (N.D. Ohio Jan. 22, 2020).  The Court found that Bryant's Complaint "never rises about the speculative level" because Bryant "states only that she has a learning difference" but "does not provide any information as to what type of learning difference she has, whether this substantially limits one or major life activities, or how her learning difference was a motivating factor in the treatment she received from her employer."  *Id*. at * 3.  The Court concluded that "[a]llegations of unprofessional conduct in the workplace, without any facts connecting that conduct to Plaintiff's alleged disability are not enough to state a claim under the ADA."  *Id*.

    **2.**    ***Bryant II***

---

[9] As noted above, in *Bryant I*, Bryant alleged that she was subjected to harassment and a hostile work environment "based on [r]eprisal," and that the harassment intensified because Bryant filed an EEO Complaint. *Bryant v. Wilkie*, Case No. 1:19-cv-2048 (N.D. Ohio) (Doc. No. 1 at pp 2-4.)  However, the *Bryant I* Court did not construe the Complaint to contain a separate retaliation claim under the ADA. *See Bryant,* 2020 WL 364224 at *1 ("Plaintiff claims Deal and her coworkers created a hostile work environment by their harassment.")

11

Shortly thereafter, on April 3, 2020, Bryant filed two *pro se* lawsuits against the Secretary of VA.  *See Bryant v. Wilkie*, Case No. 1:20cv726 and 1:20cv732.  As Exhibits to her Complaints, Bryant attached the FAD issued in connection with EEO 638, which involved both her November 2018 EEO Complaint relating to her non-selection for the 2018 Painter position and her February 8, 2019 EEO Complaint relating to the transfer of Ms. Arthur to Bryant's shift.  *See* Case No. 1:20cv726 (Doc. No. 1-1); Case No. 1:20cv732 (Doc. No. 1-1.)  On August 28, 2020, this Court consolidated Bryant's cases under Case No. 1:20cv726 (hereinafter referred to as "*Bryant II*").

On June 10, 2021, Bryant filed an Amended Complaint.  *See Bryant v. Wilkie*, Case No. 1:20cv726 (Doc. No. 31.)  Therein, Bryant identified the following five claims: (1) "Discrimination (Claim Based on Disability) Mental and Reprise; (2) Retaliation for participation in an EEO Activity; (3) "10.7 Civil Right—Title VII—Hostile Work caused by Non-Immediate Supervisor or by Co-Worker (Claim Based on Negligence);" (4) Institutionalized/Systemic Racism; and (4) "Non-selection of Paint Position—Claim based on Sex (Female and Disability (Mental)."  (*Id*. at Doc. No. 31.)

The Secretary filed a Partial Motion to Dismiss on July 15, 2021, seeking dismissal of all Bryant's claims except her discrimination claim based on her non-selection for the 2018 Painter position.  (*Id*. at Doc. No. 34.)  Bryant opposed the Motion.  (*Id*. at Doc. No. 37.)  On November 17, 2021, this Court granted the Secretary's Motion.  (*Id*. at Doc. No. 42.)  Of note, the Court dismissed Bryant's retaliation claim on the basis of *res judicata*, finding (in relevant part) that "Bryant's instant claim of retaliation for engaging in an EEO activity arises from the same series of transactions—i.e., the alleged hostile work environment Bryant endured in retaliation for filing an EEOC complaint

12

about Deal and [Dionna] Arthur—as in *Bryant I* and therefore should have been litigated in the first action." (*Id*. at pp. 11-12.)

After discovery, the Secretary moved for summary judgment with respect to Bryant's discrimination claim based on her non-selection for the 2018 Painter position.  On August 30, 2022, this Court issued a Memorandum Opinion & Order granting the Secretary's Motion.  (*Id*. at Doc. No. 52.)  The Sixth Circuit Court of Appeals affirmed on June 28, 2023.  (*Id*. at Doc. No. 58.)

## II.    Procedural History

Bryant filed the instant action on February 7, 2022.  (Doc. No. 1.)  Shortly thereafter, on February 14, 2022, Bryant filed a "Supplement" to her Complaint, which Defendant interprets to be an Amended Complaint.  (Doc. No. 5.)  Therein, Bryant alleges claims against Defendant for (1) retaliation for engaging in EEO activity; and (2) harassment/hostile work environment under Title VII.  (*Id*. at pp. 1, 3.)  Both of Bryant's claims are based on the underlying conduct set forth in her December 2017 EEO Complaint (i.e., EEO 764) and addressed in the November 10, 2021 FAD. Specifically, Bryant alleges that she was unfairly scheduled to "back-to-back heavy duties for months and forced to work in a Hostile Work Environment" in retaliation for her filing her March 2016 EEO Complaint.  (*Id*. at p. 3.)  Bryant claims that "the result of plaintiff being assigned to these heavy dut[ies] back-to-back was that she develop[ed] varicose veins in both legs." (*Id*. at p. 4.)  She also alleges that Deal's unfair scheduling practices caused her emotional and mental distress.  (*Id*.)  Bryant seeks compensatory and punitive damages, and requests that the Court order her to be moved up three (3) steps in the "GS grade and step system." (*Id*. at p. 5.)  Lastly, Bryant requests that she be permitted "to retire when this case is over with her full salary for the rest of her life." (*Id*.)

On March 18, 2022 and April 4, 2022, Bryant filed additional "Supplements" to her Complaint. (Doc. Nos. 8, 9.) Therein, Bryant restates her retaliation and hostile work environment claims and attaches numerous Exhibits, including various medical records and photographs relating to her varicose veins.[10] (Doc. Nos. 8, 9.)

Defendant filed an Answer to Plaintiff's Amended Complaint and "Supplements" on August 30, 2022. (Doc. No. 22.) On November 8, 2022, the Court conducted a Case Management Conference ("CMC") at which time various case management deadlines were set. (Doc. No. 30.) Among other things, the Court set December 7, 2022 as the deadline for amending the pleadings and/or adding additional parties. (*Id*.) On January 10, 2023, Bryant moved to amend her Complaint to add four additional claims based on the VAMC's denial of her requests for medical leave in November and December 2022. (Doc. Nos. 33, 36.) On March 10, 2023, the Court denied Bryant's Motion. (Doc. No. 37.)

On October 2, 2023, Defendant filed a Motion for Summary Judgment. (Doc. No. 48.) Bryant filed a Brief in Opposition on October 23, 2023, to which Defendant replied on November 7, 2023. (Doc. Nos. 49, 50.)

### III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A

---

[10] The docket reflects that Bryant thereafter filed various documents captioned as "Additional Evidence" and "Varicose Vein Exhibits" in June, August, and October 2022. (Doc. Nos. 16, 21, 27.) These filings consisted of Bryant's personal medical records and photographs relating to her medical conditions. On October 17, 2022, the Court ordered Bryant to "cease filing frivolous or unnecessary documents, exhibits, motions and/or other filings." *See* Non-Doc Order dated Oct. 17, 2022. After Bryant subsequently filed a "Motion to Add Additional Evidence" on December 5, 2022, this Court restricted her from filing any further documents in this case without first seeking leave from the Court to do so. *See* Non-Doc. Order dated Dec. 7, 2022.

dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004)). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487 (citing *Hedrick*, 355 F.3d at 451).

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[T]he moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 256). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 325).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."

15

*Ask Chems.*, 593 Fed. Appx at 508–09 (citing *Anderson*, 477 U.S. at 256).  "[T]he nonmoving party may not simply rely on its pleading but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.    Analysis

Defendant argues that he is entitled to summary judgment on Bryant's claims for several reasons.  (Doc. No. 48-1.)  As an initial matter, Defendant argues that, "[w]hile Bryant has asserted a claim styled as harassment/hostile work environment under Title VII, she admitted at deposition that she is really asserting a claim for retaliation."  (*Id*. at p. 1, fn 2; pp. 8-9.)  Thus, Defendant maintains that Bryant's retaliation and "harassment/hostile work environment" claims should both be considered under "the legal standard for retaliation."  (*Id*.)

Defendant then maintains that Bryant's retaliation claims are barred by the doctrine of *res judicata*.  (*Id*. at pp. 9-11.)  Defendant notes that this Court already determined, in *Bryant II*, that Bryant's retaliation claims were barred by *res judicata* because her claims stemmed from the same "series of transactions" at issue in *Bryant I*, which was a final order on the merits.  (*Id*.)  Defendant asserts that, "as in *Bryant II*, 'Bryant's instant claim of retaliation for engaging in an EEO activity arises from the same series of transactions … as in *Bryant I* and therefore should have been litigated' in *Bryant I.*"  (*Id*. at p. 11) (quoting Case No. 1:20cv726 (Doc. No. 42.))  Alternatively, Defendant argues that Bryant cannot demonstrate a genuine issue of material fact as to two of the *prima facie* elements of her retaliation claim, i.e., that she suffered an adverse employment action or that there is a causal connection between an adverse employment action and her protected activity.  (*Id*. at pp. 11-16.)

Bryant's *pro se* Brief in Opposition is somewhat difficult to decipher, but she appears to dispute Defendant's assertion that her "harassment/hostile work environment" claim is the same as her claim for retaliation.  (Doc. No. 49 at p. 3.)  She then asserts that the instant case is not barred by *res judicata*, asking "how can this case be barred by *res judicata* when the claims in this case were not accepted as part of Plaintiff's first complaint (1:19cv000726) filed in the district on September 5, 2019?" (*Id*. at pp. 14, 25-26.)  Lastly, Bryan argues generally that there are genuine issues of material fact that preclude summary judgment on her retaliation and harassment/hostile work environment claims.  (*Id*. at pp. 3-4, 5, 16.)

### A.     Whether Bryant Has Asserted a Separate Claim for "Harassment/Hostile Work Environment"

The Court first addresses Defendant's argument that Bryant's "harassment/hostile work environment" is, in fact, a claim for retaliation and should be considered under "the legal standard for retaliation."  (Doc. No. 48-1 at p. 1, fn. 2, pp. 8-9.)  As noted above, Bryant disputes that her retaliation and harassment/hostile work environment claims are one and the same, arguing that she has asserted a separate claim for harassment and hostile work environment based on Deal's unfair scheduling practices.  (Doc. No. 49 at p. 3.)

As Defendant correctly notes, during her deposition, Bryant was specifically asked to identify the basis of her harassment/hostile work environment claim.  Bryant testified, as follows:

Q:     Ms. Bryant, you made a claim of harassment in this case or hostile work environment in this case. What exactly do you mean by hostile work environment?

A:     I mean, the way I feel.  My belief is, I'm not sure how the dictionary says it, Kara Deal reassigning me to heavy work duties, changing me off my schedule, that's hostile work environment to me.

17

Q:    Okay. So if you – **what's the basis then for the harassment or hostile work environment related to those reassignments in October of 2017?**

A:    **Prior EEO activity, retaliation for prior EEO activity.**

Q:    So the hostile work environment claims that you've asserted in this case are based on retaliation claims that you've asserted in the case, correct?

A:    Not this case, the other case, prior case, the one from 2016. **Everything that I feel happened in this case was retaliation because of that case from 2016.**

(Bryant 7/7/23 Depo. (Doc. No. 46-1) at Tr. 113-115) (emphasis added). Based on the above testimony, Defendant asserts that Bryant's harassment/hostile work environment claim is essentially duplicative of her retaliation claim and that her harassment/hostile work environment claim should be evaluated under the same standard as her retaliation claim. (Doc. No. 48-1 at p. 1, fn. 2; pp. 8-9.)

For the following reasons, the Court does not agree. The Sixth Circuit has repeatedly recognized a distinction between retaliation claims, and harassment/hostile work environment claims that are based on retaliatory conduct (or "retaliatory hostile work environment" claims). *See, e.g., Johnson v. Donahoe*, 642 Fed. Appx. 599, 611 (6th Cir. 2016); *Shaw v. Donahoe*, 605 Fed. Appx. 494, 501 (6th Cir. 2015); *Dean-Lis v. McHugh*, 598 Fed. Appx. 412, 415 (6th Cir. 2015); *Khamati v. Sec'y of the Dept. of the Treasury*, 557 Fed. Appx. 434, 443 (6th Cir. 2014). *See also Ogbonna-McGruder v. Austin Peay State University*, 91 F. 4th 833, 841-842 (6th Cir. 2024); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791-793 (6th Cir. 2000); *Robinson v. Quicken Loans LLC*, 2022 WL 4234072 at * 9 (6th Cir. Sept. 14, 2022).

While it is true that the Sixth Circuit has sometimes characterized retaliatory hostile work environment claims "as a variety of retaliation," that court has emphasized that it applies to such claims a different (or "modified") version of the *prima facie* elements that are applied in a typical retaliation claim. *Khamati*, 557 Fed. Appx. at 443. Specifically, in a "typical" retaliation claim under

18

Title VII and the Rehabilitation Act, a plaintiff must demonstrate the following four elements by a preponderance of the evidence: (1) she engaged in activity that Title VII and/or the Rehabilitation Act protects; (2) defendant knew that she engaged in this protected activity; (3) the defendant subsequently took an employment action adverse to the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action exists. *See Abbott v. Crown Motor Co*., 348 F.3d 537, 542 (6th Cir. 2003); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000*); Gribcheck v. Runyon,* 245 F.3d 547, 550 (6th Cir. 2001).

To establish a *prima facie* case of retaliatory hostile work environment, the plaintiff must also demonstrate the first, second, and fourth of the elements listed above. Notably, however, the third element of a *prima facie* case for retaliatory hostile work environment is different. The third element of a retaliatory hostile work environment claim requires a plaintiff to demonstrate that "the defendant subjected [her] to severe or pervasive retaliatory harassment." *See Khamati*, 557 Fed. Appx. at 443; *Johnson*, 642 Fed. Appx. at 612; *Ogbonna-McGruder*, 91 F.4th at 841; *Morris*, 201 F.3rd at 792. Indeed, the Sixth Circuit has noted that the "touchstone of any hostile work environment claim" (including a claim for retaliatory hostile work environment) is "whether 'the workplace is permeated with 'discriminatory intimidation, ridicule, and insult, that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Khamati*, 557 Fed. Appx. at 443 (quoting *Harris v. Forklift Sys, Inc*., 510 U.S. 17, 21 (1993)). *See also Johnson*, 642 Fed. Appx. at 611.

Here, Bryant argues that Deal harassed her and created a hostile work environment in retaliation for filing the March 2016 EEO Complaint. (Doc. No. 49 at p. 3.) She maintains that this harassment included "forc[ing] her to work back to [back] heavy work schedules for months" and,

further, that "management knew that the plaintiff was being harassed because the plaintiff reported it to both the first shift supervisor and assistant chief [of the] sterile processing department."  (*Id*.) Bryant argues that management nonetheless "failed to take prompt, effective remedial action reasonably calculated to end the retaliation and harassment."  (*Id*.)

Accordingly, and considering the Sixth Circuit authority noted above, the Court will treat Bryant's retaliation claim and harassment/hostile work environment claim as separate and distinct claims.

## B.    Retaliation Claim

The Court will next consider whether Bryant has come forward with sufficient evidence to establish a *prima facie* case for retaliation.[11]   Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).  Retaliation claims under the Rehabilitation Act[12] employ the same burden-shifting framework used in Title VII retaliation claims.  *See Gribcheck*, 245 F.3d at 550.  *See also Madden v. Brennan,* 2019 WL 4729777 at * 1 (6th Cir. Sept. 11, 2019).

---

[11] The Court declines to address Defendant's argument that Bryant's claims are barred by *res judicata*.  As noted above, Bryant's current retaliation and harassment/hostile work environment claims stem from Deal's allegedly retaliatory decision to schedule Bryant to back-to-back heavy job assignments. Bryant filed a formal EEO Complaint regarding these claims in December 2017, which was not fully exhausted until the OEDCA issued a FAD on November 10, 2021.  Given this timing, it is not entirely clear that Bryant could have raised her current retaliation and harassment/hostile work environment claims in *Bryant I*, as they would not yet have been exhausted.  Defendant does not directly address this timing issue or cite any authority demonstrating that *res judicata* would apply under these circumstances.  Moreover, the Court finds it unnecessary to reach this issue because, as set forth *infra*, Bryant has failed to establish a *prima facie* case of either retaliation or retaliatory hostile work environment.

[12] The Rehabilitation Act "constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (citation omitted).  *See also Mitchell v. United States Postal Service*, 738 Fed. Appx. 838, 842 (6th Cir. 2018).

To establish that a defendant engaged in retaliation in violation of Title VII or the Rehabilitation Act, a plaintiff may rely on either direct or circumstantial evidence.  *See Daniels v. Pike Cty. Comm'rs,* 706 Fed. Appx 281, 291 (6th Cir. 2017); *Johnson v. Kroger Co*., 319 F.3d 858, 864-65 (6th Cir. 2003).  Direct evidence is evidence which, if believed, requires the conclusion that unlawful retaliation was at least a motivating factor in the employer's actions.  *See Johnson,* 319 F.3d at 865; *Imwalle v. Reliance Med. Prods., Inc*., 515 F.3d 531, 543-44 (6th Cir. 2008).  Here, Bryant has not directed this Court's attention to any direct evidence that Deal scheduled her to back-to-back heavy job assignments in retaliation for her filing of the March 2016 EEO Complaint.  Rather, Bryant relies on circumstantial evidence, i.e., evidence from which one could draw a conclusion of unlawful retaliation only by making a series of inferences.  *See Abbott*, 348 F.3d at 542.

Thus, the Court analyzes Bryant's retaliation claim under the burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973).  *See Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002) (noting that, in the absence of direct evidence, retaliation claims are governed by the *McDonnell Douglas* burden-shifting framework).  *See also Abbott,* 348 F.3d at 542; *Lisan v. Wilkie*, 835 Fed. Appx. 831, 834 (6th Cir. 2020).  Under this framework, the plaintiff faces the initial burden of presenting a *prima facie* case of unlawful retaliation.  *See Johnson*, 319 F.3d at 866; *Lisan*, 835 Fed. Appx. at 834.

As noted above, to establish a *prima facie* case of unlawful retaliation, Bryant must demonstrate by a preponderance of the evidence that: (1) she engaged in activity that Title VII and/or the Rehabilitation Act protects; (2) Defendant knew that she engaged in this protected activity; (3) Defendant subsequently took an employment action adverse to the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action exists. *See Abbott*, 348

21

F.3d at 542; *Nguyen*, 229 F.3dat 563; *Gribcheck,* 245 F.3d at 550. "The burden of establishing a

*prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen,* 229 F.3d at 563.[13]

Here, Defendant argues that Bryant cannot demonstrate a genuine issue of material fact as to

third and fourth elements of her *prima facie* case, i.e., an adverse employment action or causation.

(Doc. No. 48-1 pp. 11-16.) The Court will address each of these elements separately, below.

### 1.    Adverse Employment Action

Defendant asserts that Bryant cannot establish that she experienced an adverse employment

action because "[w]orking in back-to-back heavy job assignments was sometimes required of SPS

technicians since four of six assignments were 'heavy' and Bryant worked five days per week." (Doc.

No. 48-1 at p. 13.) Defendant further notes that the job description for Bryant's position specifically

stated that a technician be able to lift up to 50 pounds and stand for up to eight hours.[14] (*Id*.) Lastly,

Defendant argues that it is undisputed that SPS was short-staffed on both October 27 and 31, 2017

and that Decontamination was a critical function. (*Id*.) Thus, Defendant maintains, "reassigning

[Bryant] on these particular days to a heavier job Decontamination was not an adverse action." (*Id*.)

---

[13] "After proving the existence of a *prima facie* case, the burden [of production] shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action." *Nguyen*, 229 F.3d at 562. If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action. *See Abbott*, 348 F.3d at 542; *Lisan*, 835 Fed. Appx. at 834. If the plaintiff demonstrates that the defendant's proffered, non-discriminatory reason is a pretext, then the fact finder may infer unlawful retaliation. *Id*. "Throughout the entire *McDonnell Douglas* framework, the plaintiff bears the burden of persuasion." *Id*. (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,511 (1993)).

[14] It does not appear that the job description for SPS technician is included in the record before this Court. Defendant relies solely on Bryant's deposition testimony regarding her understanding of the job description but does not direct this Court's attention to the actual job description itself. The Court notes that Bryant expressed some confusion regarding the job description for SPS tech, testifying that she did not know that it included lifting up to 50 pounds. (Bryant 7/27/23 Depo. at Tr. 37.) She did agree, however, that the job description for SPS technician included the possibility of being on her feet for up to eight (8) hours per day. (*Id*. at Tr. 139.)

In her Brief in Opposition, Bryant does not directly address Defendant's legal argument that her reassignments to "heavy" jobs on October 27 and October 31, 2017 does not constitute an "adverse employment action" for purposes of establishing the second element of her *prima facie* case. (Doc. No. 49.) Bryant does argue, generally, that she "was always assigned back-to-back heavy work assignments" and that "other coworkers were not being singled out" by Deal. (*Id.* at p. 24.) She also maintains that she "had no idea that the requirements for this job were to lift 50 pounds." (*Id.* at p. 6.)

An adverse employment action may be established under Title VII's anti-retaliation provision by showing "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Laster v. City of Kalamazoo*, 746 F.3d 714, 719 (6th Cir. 2014). As the Supreme Court explained:

> We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.
>
> We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here.

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." A schedule change in an employee's work schedule may make little difference to many workers but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others."

*Burlington*, 548 U.S. at 69 (emphasis in original) (internal citations omitted).  *See also Shaw*, 605 Fed. Appx. at 497; *Spence v. Donahoe*, 515 Fed. Appx. 561, 572 (6th Cir. 2013).

For the following reasons, the Court finds that Bryant's reassignment to "heavier" job duties on October 27 and 31, 2017 does not constitute an "adverse employment action" under the circumstances presented.  As Defendant correctly notes, it is undisputed that SPS was short-staffed on both October 27 and October 31, 2017.  (Bryant 7/27/2023 Depo. at Tr. 68-69, 89.)  Thus, as Bryant herself acknowledged, the weekly schedule had to be changed to ensure that each of the SPS job assignments (i.e., Decontamination, Autoclave, OR Runner, Clinic Runner, STERRAD, and Assembly) were covered.  (*Id.* at Tr. 43-44, 51, 86-88.)  Given that Bryant characterized four of the six SPS job assignments as "heavy," (*id.* at Tr. 125), it is not surprising that reassignments due to short staffing might mean "back-to-back" heavy assignments on occasion.

Moreover, although Bryant testified that she believed Deal was "supposed to" assign the overtime technician to the heavier assignment and let the first shift technician do his/her original assignment, Bryant could not point to any written VAMC policy or procedure (or other evidence) that required Deal to do so.  (*Id.* at Tr. 70-71, 76, 78 -82.)  Indeed, Bryant acknowledged that, as Lead

24

Tech, Deal had the discretion to change the weekly schedule as necessary to ensure that all SPS job assignments were covered.  (*Id*. at Tr. 76-77, 83, 89.)  Thus, although the Court understands that it was an inconvenience, Bryant's reassignment to a heavier assignment on the dates in question due to short staffing did not constitute a "materially adverse employment action" for purposes of establishing a *prima facie* case of unlawful retaliation.[15]

Accordingly, and for all the reasons set forth above, the Court finds that Bryant has failed to establish that her reassignment to heavy job duties on October 27 and October 31, 2017 constitute "materially adverse" employment actions for purposes of the second element of her *prima facie* case of unlawful retaliation.

### 2.     Causation

Even assuming *arguendo*, however, that Bryant's reassignment to back-to-back heavy duties in October 2017 constitutes a "materially adverse" employment action, the Court finds that Bryant

---

[15] The Court recognizes that the Supreme Court has held that a change in an employee's job duties could be considered "materially adverse" under certain circumstances.  In *Burlington, supra*, the plaintiff, Sheila White, was reassigned from forklift duty at Burlington's Tennessee Yard to "standard track laborer tasks," after she complained that her immediate supervisor had made insulting and inappropriate remarks to her relating to her gender. *Burlington*, 548 U.S. at 58.  The Supreme Court upheld a jury's verdict that this change in White's job duties was "materially adverse," explaining, in relevant part: "Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Id*. at 71. The Court finds the instant case to be distinguishable from *Burlington*.  In that case, Plaintiff White's job responsibilities were permanently and negatively altered. Prior to complaining about her supervisor's inappropriate remarks, White's primary responsibility had been forklift duty, which was less arduous and "objectively considered a better job" than track laborer.  *Id*. at 58, 71. After complaining about her supervisor, Burlington "told White that [it] was removing her from forklift duty and assigning her to perform only standard track laborer tasks." *Id*. at 58.  White's reassignment was, therefore, permanent --- she was no longer permitted to perform forklift duty and was limited solely to performing the less desirable track laborer tasks. By contrast, in the instant case, Bryant was reassigned to heavier assignments on the two occasions at issue because SPS was short staffed, and all job assignments needed to be covered.  (Bryant 7/27/23 Depo. at Tr. 68-69, 89.)  Bryant admitted in deposition that, while she worked back-to-back heavy assignments at times, she also was assigned to the "easier" assignments of STERRAD and Assembly, which allowed her to sit down throughout the day.  (*Id*. at Tr. 123-124.)  In other words, Bryant does not argue (and there is no evidence) that she was permanently reassigned to perform only the heaviest job assignments in SPS.  Thus, the Court finds that the challenged employment action in this case is distinguishable from the "materially adverse" permanent reassignment of job duties in *Burlington, supra*.

has failed to demonstrate the fourth element of her *prima facie* case, i.e., a causal connection between her reassignment to back-to-back heavy duties and her March 2016 EEO Complaint.

In the retaliation context, a causal connection between an employer's actions and a protected activity is established when the protected activity was the "but-for" cause of the alleged adverse action by the employer. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "But-for" causation means that the plaintiff must furnish evidence that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* *See also Lisan*, 835 Fed Appx. at 835; *Mys v. Michigan Dept of State Police*, 886 F.3d 591, 600 (6th Cir. 2018). "Causation can be established by indicia of retaliatory conduct, such as evidence that the plaintiff was treated differently than similarly situated employees who did not engage in protected activity or evidence that the plaintiff was subjected to closer disciplinary scrutiny after engaging in protected activity." *Green v. Central Ohio Transit Authority*, 647 Fed. Appx. 555, 560 (6th Cir. 2016). *See also Evans v. Prospect Airport Servs., Inc.*, 286 Fed. Appx. 889, 895 (6th Cir. 2008) (citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364–65 (6th Cir. 2001)).

In addition, "[o]ne factor relevant to determining whether causation is satisfied in this setting is whether an adverse action occurs close in time to the employer learning of a protected activity, what we refer to in our cases as 'temporal proximity.'" *Jones v. Vilsack*, 861 Fed. Appx. 58, 61 (6th Cir. 2021) (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 550 (6th Cir. 2008)). *See also Lisan*, 835 Fed. Appx. at 835 ("Temporal proximity may raise an inference of retaliation.") Temporal proximity on its own is usually not sufficient to establish causation. *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020); *Lisan*, 835 Fed. Appx. at 835. However, the Sixth Circuit has found that it can be sufficient if the adverse action was "taken just days or weeks from when the

employer learns of the employee's protected activity." *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020).  *See also Wyatt v. Nissan North America, Inc.,* 999 F.3d 400, 421 (6th Cir. 2021); *Zandvakili v. Univ. of Cincinnati*, 2024 WL 278548 at * 8 (6th Cir. Jan. 25, 2024).

Here, Defendant argues that Bryant cannot prove causation because she admitted in deposition that SPS was short-staffed on both October 27 and 31, 2017 and that Deal also moved other employees to heavy assignments.  (Doc. No. 48-1 at pp. 14-15.)  Defendant also emphasizes that Bryant admitted in deposition that she has no evidence that Deal reassigned her to heavier jobs on either October 27 or October 31, 2017 out of retaliation for filing an EEO Complaint.  (*Id.* at p. 15.) Bryant does not directly address the issue of causation in her Brief in Opposition.  (Doc. No. 49.)

For the following reasons, the Court finds that Bryant has failed to establish causation.  While Bryant strongly believes that Deal reassigned her to heavier shifts on October 27 and 31, 2017 in retaliation for her March 2016 EEO Complaint, Bryant has not directed this Court's attention to any evidence to support this assertion other than her own subjective belief that it is so.  Indeed, in her deposition, Bryant expressly acknowledged that she had no evidence that Deal reassigned her in October 2017 because she had filed her March 2016 EEO Complaint:

> Q:     Why do you believe that Kara Deal moved you to decontam on October 27th or October 30th of 2017?
>
> A:     Retaliation for filing my prior EEO complaint against her.
>
> Q:     What's your evidence for that?
>
> A:     **I don't have any evidence.  That's what I believe**.  ***
>
> ***
>
> Q:     So looking though at Exhibit B, EEO charge 764, the first claim that you have, which you dated October 27 of 2017, …, what is your evidence that Kara Deal changed your assignment out of retaliation for filing an EEO prior?

27

> A:    **I don't have any evidence.**
>
> Q:    Likewise, then, looking at Exhibit B, your EEO charge 764, the second incident of your reassignment to a different workload occurred on October 31, 2017 …, what's your evidence that Kara Deal made that assignment out of retaliation for filing a prior EEO?
>
> A:    **I have no evidence for that.  That's what I believe**.

(Bryant 7/27/23 Depo. at Tr. 83-85) (emphasis added).

In the absence of any other admissible evidence, Bryant's subjective belief that Deal reassigned her to heavier shifts on October 27 and October 31, 2017 is not sufficient to survive summary judgment. *See Green,* 647 Fed. Appx. at 560-561 (finding plaintiff failed to establish causation where she "points to no facts, just her own subjective belief"); *Dean-Lis,* 598 Fed. Appx. at 415 (finding plaintiff's subjective beliefs about supervisor's actions were insufficient to establish causation).  *See also Alexander v. Ohio State Univ. College of Social Work*, 697 F.Supp.2d 831, 851 (S.D. Ohio 2010) ("A plaintiff's subjective beliefs or impressions are insufficient to create an inference of retaliation."); *Johnson v. Cargill, Inc*., 932 F.Supp.2d 872, 892 (W.D. Tenn. 2013) ("'Subjective beliefs, without affirmative evidence, are insufficient to establish a claim of retaliation.'") (quoting *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 491 (6th Cir. 2006)).

Bryant argues generally that Deal "singled her out" and treated her differently than other SPS technicians because of her March 2016 EEO Complaint.  As noted *supra*, causation can be established by evidence that "the plaintiff was treated differently than similarly situated employees who did not engage in protected activity." *Green*, 647 Fed. Appx. at 560.  Here, however, Bryant does not identify any specific, allegedly similarly situated SPS technicians who she believes Deal favored in terms of assigning (or reassigning) SPS job assignments.  Nor does she point to any evidence that Deal treated

28

any such technicians differently than Bryant because those technicians (unlike Bryant) had not engaged in prior EEO activity.  Rather, once again, Bryant relies instead solely on speculation and her own subjective belief that Deal used her scheduling discretion to favor her "friends" and punish Bryant for her March 2016 EEO Complaint.  Standing alone, this is not sufficient to survive summary judgment. *See Green,* 647 Fed. Appx. at 560-561; *Dean-Lis,* 598 Fed. Appx. at 415

Bryant does not argue that causation can be inferred from temporal proximity alone.  But even if she had, any such argument would be without merit.  Bryant testified that "[e]verything that I feel happened in this case was retaliation because of that case from 2016," i.e., her March 2016 EEO Complaint.  (Bryant 7/7/23 Depo. at Tr. 114-115.)  Over 1 year and 7 months (or 19 months) elapsed between the filing of Bryant's March 2016 EEO Complaint and her reassignment to "heavy" duties in October 2017.[16]  This period of time is too long to demonstrate (or create an inference of) causation. *See Johnson*, 642 Fed. Appx. at 606 (finding period of nineteen months between alleged adverse action and protected activity "'suggests, by itself, no causality at all'") (quoting *Clark Cty Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001)).  *See also Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022) (noting that "three months passed between Boshaw's complaint to Kepler and his termination, a firm indicator of a lack of a causal link."); *Jones*, 861 Fed. Appx. at 63 (finding that

---

[16] Although Bryant only listed the two specific incidents on October 27 and 31, 2017 in her December 2017 EEO Complaint, she argues herein that, in fact, Deal's unfairly scheduling practices had been going on "for months."  (Bryant 7/27/23 Depo. at Tr. 64-65, 116.)  The Court will address this contention in more detail in connection with Bryant's retaliatory hostile work environment claim.  However, even if considered in the context of her retaliation claim, the Court notes that Bryant has failed to demonstrate causation for all the reasons set forth above. Bryant offers no evidence that any of Deal's allegedly unfair scheduling practices (regardless of when they occurred) were because of Bryant's March 2016 EEO Complaint.  Further, Bryant does not identify any similarly situated SPS technicians who had not engaged in prior EEO activity who Deal treated differently, or better, than Bryant.  Lastly, regarding temporal proximity, Bryant testified that Deal's unfair scheduling practices had been going on since "April, May, June, July 2017." (*Id.* at Tr. 120.) Even considering this expanded time frame, the Court finds that causation cannot be inferred from temporal proximity because over a year elapsed between Bryant's March 2016 EEO Complaint and April 2017.

seven months "between an alleged adverse action and protected activity is too long to support an inference of causation").

Accordingly, and for all the reasons set forth above, the Court finds that Bryant has failed to establish the fourth element of her *prima facie* case of retaliation, with respect to either the October 27, 2017 incident or the October 30, 2017 incident. The Court, therefore, grants summary judgment in Defendant's favor on Bryant's retaliation claims.

### 2. Retaliatory Hostile Work Environment

Lastly, as discussed above, the Court finds that Bryant has asserted a separate and distinct claim for retaliatory hostile work environment. A retaliatory hostile work environment claim "require[s] application of the *McDonnell Douglas* burden-shifting scheme where [as here] the plaintiff presents circumstantial evidence of wrongs." *Khamati*, 557 Fed. Appx. at 442. *See also Dean-Lis*, 598 Fed. Appx. at 415. To establish a *prima facie* case of retaliatory hostile work environment, a plaintiff must demonstrate the following four elements: 1) the plaintiff engaged in a protected activity; 2) the defendant knew this; 3) the defendant subjected the plaintiff to severe or pervasive retaliatory harassment; and 4) the protected activity is causally connected to the harassment. *Khamati*, 557 Fed. Appx. at 442. *See also Morris*, 201 F.3rd at 792; *Dean-Lis*, 598 Fed. Appx. at 415.

As noted *supra*, the touchstone of any hostile work environment claim, including a retaliatory hostile work environment claim, is whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Khamati*, 557 Fed. Appx. at 442 (quoting *Harris*, 510 U.S. at 21.) Courts consider "the frequency of the discriminatory conduct; its

30

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. (quoting *Harris,* 510 U.S. at 23.)

Here, Bryant argues that Deal harassed her and created a hostile work environment in retaliation for filing the March 2016 EEO Complaint.  (Doc. No. 49 at p. 3.)  She maintains that this harassment included "forc[ing] her to work back to [back] heavy work schedules for months." (*Id*.)  Bryant further asserts that "management knew that the plaintiff was being harassed because the plaintiff reported it to both the first shift supervisor and assistant chief [of the] sterile processing department."  (*Id*.)  She argues that management nonetheless "failed to take prompt, effective remedial action reasonably calculated to end the retaliation and harassment."  (*Id*.)

Defendant does not directly address the *prima facie* elements of Bryant's retaliatory hostile work environment claim.  (Doc. No. 48-1.)  However, in his Reply Brief, Defendant does argue that Bryant's December 2017 EEO Charge only included the two specific instances of alleged retaliation on October 27 and October 31, 2017 and did not allege ongoing retaliatory conduct by Deal in the form of unfair scheduling.  (Doc. No. 50 at p. 4.)  Defendant asserts that, because the alleged ongoing retaliation occurred before Bryant filed the December 2017 EEO Complaint, Bryant was required to either include allegations of ongoing harassment in the December 2017 EEO Complaint, or to supplement that Complaint to include allegations of ongoing harassment.  (*Id*. at p. 5.)  Bryant failed to do so.  Defendant therefore argues that "Bryant cannot litigate these additional allegations of scheduling retaliation, because she failed to exhaust administrative remedies." (*Id.* at p. 6.)

Because Defendant raised this argument for the first time in his Reply Brief, Bryant did not have the opportunity to respond.

31

The Court need not reach the issue of whether Bryant exhausted her administrative remedies with respect to her claim of ongoing harassment in the form of Deal's alleged retaliatory scheduling practices. Even assuming *arguendo* that this claim is exhausted, the Court finds that Bryant failed to establish the fourth element of her *prima facie* case, i.e., that the protected activity is causally connected to the harassment. *Khamati*, 557 Fed. Appx. at 442. *See also Dean-Lis*, 598 Fed. Appx. at 415 ("Here too she must show that her protected activity (the 2004 EEO Complaint) caused the adverse action ('severe or pervasive retaliatory harassment by a supervisor'")) (quoting *Morris,* 201 F.3d at 792.) Aside from her own subjective beliefs, Bryant has not directed this Court to any evidence that Deal's alleged ongoing retaliatory scheduling practices were caused by Bryant's prior EEO activity. As the Sixth Circuit has explained, in assessing a hostile work environment claim, courts may only "consider the attributes of the work environment that arise from the plaintiff's ... performance of protected activities." *Khamati,* 557 Fed. Appx. at 444 (citing *Williams v. CSX Trans. Co., Inc*., 643 F.3d 502, 511 (6th Cir. 2011)). Failure to provide "any persuasive proof beyond mere speculation of a causal connection between ... protected activities and ... work atmosphere" justifies summary judgment dismissal of a retaliatory hostile work environment claim. *Id. See also Gumm v. AK Steel Corp*., 2023 WL 6280968 at * 13 (E.D. Mich. Sept. 26, 2023).

In this case, Bryant has not come forward with any "persuasive proof" of a causal connection between her March 2016 EEO Complaint and the hostile work environment allegedly resulting from Deal's ongoing retaliatory scheduling practices. Rather, Bryant relies solely on her speculation and her own subjective belief that such a causal connection exists. This is not sufficient to withstand summary judgment. Accordingly, and for all the reasons set forth above, the Court grants summary judgment in Defendant's favor on Bryant's retaliatory hostile work environment claim.

## V.    Conclusion

For all the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. No. 48) is GRANTED.

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
Date: March 12, 2024                    U. S. DISTRICT JUDGE